IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

RAMON ORTIZ,                §
                             §
        Plaintiff,       §
                             §
v.                         §          CIVIL NO. H-04-3184
                             §
JO ANNE B. BARNHART,      §
COMMISSIONER OF THE SOCIAL  §
SECURITY ADMINISTRATION,    §
                             §
        Defendant.      §

## <u>MEMORANDUM OPINION</u>

Pending before the court[1] are Defendant's Motion for Summary Judgment (Docket Entry No. 19) and Plaintiff's Motion for Summary Judgment (Docket Entry No. 14). The court has considered the motions, all relevant filings, the administrative record, and the applicable law. For the reasons set forth below, Defendant's Motion for Summary Judgment is **GRANTED** and Plaintiff's Motion for Summary Judgment is **DENIED**.

## I. Case Background

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) for judicial review of an unfavorable decision by the Commissioner of the Supplemental Security Administration ("Commissioner") regarding Plaintiff's claim for Supplemental Security Income under Title XVI of the Social Security Act ("the Act").

---

[1] This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Fed. R. Civ. P. 72. Docket Entry No. 9.

Plaintiff was born on August 14, 1957, and was forty years old on the alleged onset date of disability.[2]  Plaintiff claimed that he was unable to work as of November 1, 1996, due to "major depressive disorder."[3]  Plaintiff possesses a seventh grade education.[4]  Prior to the alleged onset of his disability, Plaintiff worked as a furniture mover, an apartment make-ready person, and as a janitor.[5]

Plaintiff protectively filed for Supplemental Security Income payments on October 12, 1999.[6]  The claim was denied initially and on reconsideration, and request for hearing was timely filed.[7]  On September 21, 2000, Plaintiff, represented by a non-attorney, appeared and testified before Administrative Law Judge ("ALJ") Christopher K. Bullard.[8]  A vocational expert ("VE"), Caroline B. Fisher, ("Ms. Fisher") and a medical expert ("ME"), Richard L. Pollock, M.D., ("Dr. Pollock"), were also present at the hearing.[9]  After Plaintiff testified regarding his impairments, Dr. Pollock provided his medical opinion.[10]

---

[2]     Transcript of the Administrative Proceedings ("Tr.") 30.

[3]     Tr. 30.  Plaintiff  previously filed an application for disability benefits on May 17, 1999.

[4]     Tr. 43.

[5]     Tr. 58.

[6]     Tr. 30.  Plaintiff  previously filed an application for disability benefits on May 17, 1999.

[7]     Id.

[8]     Id.

[9]     Id.

[10]    Tr. 89.

First, Dr. Pollock advised that sufficient objective medical evidence of record existed to allow him to form an opinion as to Plaintiff's status.[11]   Dr. Pollock reported that Plaintiff had an impairment of major depressive disorder, which fell under the 12.04 category, affective disorder.[12]   Additionally, Dr. Pollock opined that Plaintiff's condition was severe and met the "A" criteria.[13] Dr. Pollock also advised that Plaintiff appeared to have difficulty concentrating, thoughts of suicide, and paranoid thinking.[14]   Dr. Pollock then discussed Plaintiff's limitations under the "B" criteria.[15]

According to Dr. Pollock, Plaintiff's impairment imposed a "slight" degree of limitation upon Plaintiff's activities of daily living.[16]   He described Plaintiff's limitations on his ability to maintain social functioning and concentrate or persist in pace as "moderate."[17]   Ultimately, Dr. Pollock concluded that Plaintiff did not meet any listing with his impairment.[18]   Afterwards, the ALJ received testimony from the VE, Ms. Fisher.[19]   The ALJ posed the

---

[11]   Tr. 90.

[12]   Tr. 91.

[13]   Id.   Section 204, "A" criteria indicates an affective disorder.

[14]   Tr. 92.

[15]   Id.   Criteria "B" describes the degree of severity of an impairment.

[16]   Tr. 92.

[17]   Id.

[18]   Tr. 93.

[19]   Id.

following hypothetical:

> Assume for the purpose of a hypothetical question, an individual who is 43 years of age and who has a seventh grade education. Assume this individual has no exertional limitations. However, assume the following nonexertional limitations. Assume the individual cannot work in an environment which involves unplanned or unscheduled events. Assume this individual can only occasionally relate with co-workers and supervisors and can never relate with the public.[20]

Ms. Fisher opined that this hypothetical person would be able to perform work as a furniture mover.[21]  Ms. Fisher advised that this occupation had heavy physical demands and was unskilled labor.[22] Subsequent to the hearing, the ALJ issued a decision.  The ALJ indicated that upon reviewing all of the evidence of record, he had concluded Plaintiff was not disabled.  Plaintiff appealed.[23]

On appeal, the Appeals Council vacated the hearing decision and remanded the case for further proceedings.[24]  The Appeals Council instructed the ALJ to complete the following on remand:

> (1) Give consideration to the examining source opinion, pursuant to the provisions of 20 CFR 416.927 and Social Security Rulings 96-2p and 96-5p, and the non-examining source opinion pursuant to the provisions of 20 CFR 416.927(f) and Social Security Ruling 96-6p, and explain the weight given to such opinion evidence.  As appropriate, the Administrative Law Judge may

---

[20]   Tr. 96-97.

[21]   Tr. 97.

[22]   Tr. 95.

[23]   Tr. 30, 141.

[24]   Tr. 140-143.

4

request the examining source to provide additional evidence and/or further clarification of the opinion and medical source statements about what the claimant can still do despite the impairments (20 CFR 416.912).

(2) Evaluate the claimant's subjective complaints and provide rationale in accordance with the disability regulations pertaining to evaluation of symptoms (20 CFR 416.929) and Social Security Ruling 96-7p.

(3) Further evaluate the claimant's mental impairments in accordance with the special technique described in 20 CFR 416.920a and document application of the technique in the decision by providing specific findings and appropriate rationale for each of the functional areas described in 20 CFR 416.920a(c).

(4) Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations (20 CFR 416.945 and Social Security Rulings 85-16 and 96-8p).

(5) Give further consideration to the claimant's work under 20 CFR 416.965 and 416.974 and Social Security Ruling 83-33.

(6) Obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's past relevant work and on his occupational base (Social Security Ruling 85-15). The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such job in the national economy (20 CFR 416.966). Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational

Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

(7) Conduct any necessary further proceedings to determine whether alcoholism is a contributing factor material to a finding of disability.[25]

On October 23, 2003, the ALJ held a supplemental hearing.[26] Plaintiff, his counsel of record, and a VE, Patricia A. Cowen, appeared and testified. No medical expert was present.[27] During this hearing, Plaintiff alleged that he became disabled on November 1, 1998,[28] due to mental problems, a cyst in his neck, multiple-joint pain, and high blood pressure.[29]

## A. Plaintiff's Testimony

Upon questioning, Plaintiff reported that he had various exertional limitations.  He first advised that he could not sit longer than thirty minutes without having pain or significant discomfort.[30]  He further testified that this pain compelled him to walk or lie down.[31]  Plaintiff also said that he was unable to stand longer than fifteen to twenty minutes due to pain in his legs.[32]

---

[25]    Tr. 142-143.

[26]    Tr. 20.

[27]    Tr. 12.

[28]    Tr. 30.

[29]    Tr. 20-21.

[30]    Tr. 43.

[31]    Tr. 44.

[32]    Id.

Plaintiff advised that this pain prevented him from walking more than ten to fifteen minutes at a time.[33] He also reported that he had difficulty climbing stairs, bending or stooping, and that he required ten to fifteen minutes to walk one block.[34] Plaintiff attributed these limitations to diabetes.[35]

Plaintiff further testified that his diabetic condition interfered with his ability to eliminate bodily waste.[36] He explained that he urinated frequently and had diarrhea twice daily, at least three days per week.[37] Plaintiff advised that despite taking medication as prescribed, these problems and others persisted.[38]

According to Plaintiff, although he ceased using illegal drugs in 1981, and completely stopped drinking alcoholic beverages on July 25, 1999, he continued to have difficulties.[39] He reported, in addition to diarrhea, that he was sometimes so drowsy after taking his medication that he had to go back to bed.[40] Plaintiff testified that he believed that the medications prescribed to him for mental

---

[33]    Id.

[34]    Tr. 45.

[35]    Tr. 44.

[36]    Tr. 46.

[37]    Tr. 46-47.

[38]    Tr. 47.

[39]    Tr. 48.

[40]    Id.

health reasons were "helping a little."[41]   Plaintiff also reported that although he felt "a little bit better," he did not believe that he could function normally due to his daily drowsiness.[42]   Plaintiff attributed some of his mental health problems to his dysfunctional childhood.[43]

According to Plaintiff, he had an unstable home life as a child.[44]  He reported being raised by his aunt, who he believed was an alcoholic.[45]   Plaintiff further testified that his aunt's male companion molested him for a period of approximately three years, which began when he was eight years old.[46]  Plaintiff reported that he has had suicidal thoughts since that time and that he could no longer be around people without panicking.[47]

Plaintiff testified that, in lieu of socializing, he isolated himself.[48]  He advised that people bothered him and he felt like he could not be around them.[49]   Plaintiff further reported that he remained inside his home and only went out to go to the store.[50] Plaintiff reported that while inside he would watch television,

---

[41]     Tr. 49.

[42]     Id.

[43]     Tr. 49-50.

[44]     Tr. 50.

[45]     Id.

[46]     Id.

[47]     Tr. 50-51.

[48]     Tr. 51.

[49]     Id.

[50]     Id.

listen to the radio, or try to read.[51] He explained that he had trouble reading because he could not concentrate.[52]   Plaintiff further advised that he sometimes forgot to take his medication due to his mental impairment.[53]   Plaintiff said that he had "gotten better" about remembering to take his medication but that he still experienced other problems.[54]

According to Plaintiff, he also suffered from chest pains.[55] Plaintiff reported that on August 21, 2003, he collapsed while walking across the street.[56]   However, he testified that he did not know if it was the hot weather or his diabetes that caused the incident.[57]   Plaintiff indicated that this was the first and only time he had collapsed.[58]   Plaintiff further advised that he took medication and blood thinner for his condition.[59]   Plaintiff reported having a heart attack approximately one year before he collapsed.[60]   However, Plaintiff testified that he no longer had chest pain because of his heart.[61]   In fact, Plaintiff reported that

---

[51]     Id.

[52]     Tr. 52.

[53]     Id.

[54]     Tr. 52-55.

[55]     Tr. 53-55.

[56]     Tr. 53.

[57]     Id.

[58]     Id.

[59]     Id.

[60]     Tr. 54.

[61]     Id.

9

he   sometimes   engaged   in   activities   that   required   physical exertion.[62]

    According to Plaintiff, he could complete heavy exercise or lifting.[63]  He stated that he moved his furniture around and carried groceries   three   or   four   blocks   from   the   store.[64]    Plaintiff explained that he stopped approximately two times to take breaks when he walked from the store.[65]  Plaintiff concluded his testimony by indicating that he had provided all relevant information.[66]

    **B. Medical Record**

    Plaintiff's   medical   evidence   of   record   indicates   that   he received treatment for his impairments.  First, on April 23, 1999, the Harris County Psychiatric Center ("HCPC") treated Plaintiff for suicidal ideation and depressive symptoms.[67]  Plaintiff had a global assessment of functioning ("GAF") score of 35 upon admission.[68] Thereafter, HCPC documented that Plaintiff's depressive symptoms subsided with medication and his mood improved as well as his affect.[69]  On May 3, 1999, HCPC discharged Plaintiff, noting that

---

[62]    Tr. 55.

[63]    Id.

[64]    Id.

[65]    Id.

[66]    Tr. 56.

[67]    Tr. 286.

[68]    Id.

[69]    Id.

Plaintiff had "improved greatly."[70]  Plaintiff's GAF score was 45
upon discharge.   Among other things, Plaintiff's aftercare plan
consisted of follow-up treatment with the Mental Health Mental
Retardation Authority of Harris County ("MHMRA").

MHMRA saw Plaintiff from May 4, 1999, to November 3, 1999.[71]
Peter C. Soo, M.D., ("Dr. Soo"), of the MHMRA Bristow Center,
completed Plaintiff's assessment plan of care for outpatient
services.[72]  On May 4, 1999, Dr. Soo recorded Plaintiff's physical
health as "excellent."[73]  Dr. Soo also documented that Plaintiff had
a "mild/moderate depressed mood."[74]   Additionally, Dr. Soo noted
that Plaintiff had "logical, good [and] directed" thought form.[75]
Dr. Soo listed Plaintiff's prognosis as "[g]ood, if [patient]
continues his sobriety."[76]  Finally, Dr. Soo assigned Plaintiff a
GAF score of approximately 60.[77]

Later, on May 11, 1999, Dr. Soo diagnosed Plaintiff with major
depressive disorder, dysthemia, and ETOH abuse.[78]  Dr. Soo indicated
that, for a period of six months, Plaintiff could not work full-time

---

[70]    Id.

[71]    Tr. 3.

[72]    Tr. 316-21.

[73]    Tr. 319.

[74]    Id.

[75]    Tr. 320.

[76]    Tr. 291-93.

[77]    Id.

[78]    Tr. 307.

due to these mental impairments.[79]   Dr. Soo also noted that
Plaintiff was employable on a part-time basis and that he would
require gradual reintegration into the workforce.[80]

The MHMRA records reflected that Plaintiff's overall condition
improved until he began drinking again and repeatedly missed his
scheduled appointments.[81]   First, on July 9, 1999, Richard J.
Alexander, M.D., ("Dr. Alexander"), a MHMRA medical consultant,
documented that Plaintiff's capacity was not significantly limited,
and that Plaintiff could "remember and carry out simple
instructions, interact appropriately with others, and adapt to
routine changes in the work setting."[82]   Dr. Alexander also noted
that Plaintiff's "alleged limitations to concentrating and being
around people (paranoia) [did] not appear wholly credible or
supported by the medical and other evidence in file."[83]   Shortly
thereafter, on July 13, 1999, Plaintiff reported that he had found
work and housing at an apartment complex.[84]   On August 9, 1999, the
MHMRA Bristow Center showed Plaintiff with a GAF score of 60.[85]
However, the MHMRA also reported that after attempts to provide
Plaintiff with supported employment, Plaintiff had been discharged

---

[79]     Id.

[80]     Id.

[81]     Tr. 364.

[82]     Tr. 296.

[83]     Tr. 299.

[84]     Tr. 311.

[85]     Tr. 374.

because he did not follow through and had missed his last appointment."[86]  The following day, MHMRA staff member Myra Brayboy, along with another physician, Dr. Chuo, recorded Plaintiff's GAF score at 40 and attributed the declined rating to Plaintiff's alcoholic relapse.[87]  It was also noted that Plaintiff had been arrested for public intoxication while walking the streets in his underwear.[88]  Finally, Plaintiff's "no shows" prompted a number of requests from MHMRA staff members to close his case file.[89]

Fortunately for Plaintiff, the record indicates that MHMRA continued to provide him with services until he was successfully discharged.[90]  In fact, Plaintiff attended numerous "Sober Living Skills" group meetings and became an active participant in the discussions with his peers and the MHMRA staff.[91]  Accordingly, on September 10, 1999, after Plaintiff received a GAF score of 60, Dr. Chuo and Dr. Samuels discharged Plaintiff and referred him to the Ripley Center.[92]  However, on September 17, 1999, the record indicates the Ripley Center classified Plaintiff as "non-priority population" and refused to admit him to the clinic.[93]  Similarly, on

---

[86]    Id.

[87]    Tr. 364, 366, 368, 371.

[88]    Tr. 368.

[89]    Tr. 375-76, 380-81, 384, 386, 392, 403.

[90]    Tr. 340-43.

[91]    Tr. 341-63.

[92]    Tr. 336-39.

[93]    Tr. 334.

November 3, 1999, MHMRA discharged Plaintiff as a non-priority and listed Plaintiff's GAF score at 60.[94]

In addition to MHMRA's assessments, Plaintiff also received other medical evaluations.  On December 27, 1999, Jaime Ganc, M.D., ("Dr. Ganc"), completed a Social Security Disability Determination Psychiatric Evaluation.[95]  Dr. Ganc advised that Plaintiff had "gotten worse in the past couple of years [and that] his depression and hopelessness [was] getting more severe."[96]  Dr. Ganc reported that Plaintiff's GAF score was 45, with an inability to work.[97]  In January 2000, Zishan Samiuddin, M.D., ("Dr. Samiuddin"), saw Plaintiff three times at the Baylor Search Clinic.[98]  Dr. Samiuddin noted that Plaintiff told him that he did "not want to succeed because there is a longer way to fall."[99]  Dr. Samiuddin also reported that Plaintiff advised him that he applied for a job but was worried it would affect his "SSDI."[100]  Dr. Samiuddin reported that Plaintiff was "overall coping well."[101]

On January 25, 2000, Lyman G. Phillips, M.D., ("Dr. Phillips"), completed Plaintiff's Mental Residual Functional Capacity ("MRFC")

---

[94]    Tr. 333.

[95]    Tr. 438.

[96]    Tr. 441.

[97]    Id.

[98]    Tr. 483.

[99]    Id.

[100]   Id.

[101]   Id.

Assessment.[102]   Dr. Phillips found that Plaintiff was not significantly limited in his understanding and memory functions.[103] Dr. Phillips also considered Plaintiff not significantly limited in his sustained concentration and persistence, excluding subset seven,[104] in which he listed Plaintiff as moderately limited.[105]   Dr. Phillips listed Plaintiff's ability to accept instructions and get along with peers as moderately limited, but considered Plaintiff's other social interaction and adaptation functions not significantly limited.[106]   Dr. Phillips opined that Plaintiff retained the ability to perform simple, repetitive tasks.[107]   He also noted that Plaintiff's "alleged mental limitations [were] not fully supported by EOR."[108]

On April 3, 2000, Donald Gibson II, M.D., ("Dr. Gibson"), an internal medicine consultant, examined Plaintiff.[109]   Dr. Gibson reported that Plaintiff had "a history of minor back and neck pain for many years."[110]   He noted that Plaintiff had "some pain of the

---

[102]   Tr. 451-54.

[103]   Tr. 451.

[104]   This subset includes the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.  Id.

[105]   Id.

[106]   Tr. 452.

[107]   Tr. 453.

[108]   Id.  "EOR" appeared to indicate evidence of record.

[109]   Tr. 490-93.

[110]   Tr. 490.

right lower leg from an ankle fracture in 1980," but that Plaintiff had not required any orthopedic surgery or medication for his condition.  He opined that Plaintiff could "walk and stand for periods of 15 to 30 minutes."[111] Dr. Gibson further advised that Plaintiff had high blood pressure but that his condition did not require medication.[112]  He also reported that Plaintiff's heart was normal.[113]  Overall, Dr. Gibson opined that Plaintiff was "a pleasant male in no apparent distress."[114]  On April 13, 2000, William M. Runkle, M.D., ("Dr. Runkle"), recorded similar findings and noted that Plaintiff's alleged limitations were "not fully supported by the objective evidence."[115]

According to Plaintiff's medical record, he received a number of additional evaluations.[116]  On December 7, 2000, Dr. Samiuddin assessed Plaintiff's condition and completed a mental impairment questionnaire, which included Plaintiff's RFC and listings.[117]  Dr. Samiuddin reported that Plaintiff's impairments or treatment would cause Plaintiff to be absent from work about twice a month.[118]  Dr. Samiuddin also described the majority of Plaintiff's abilities and

---

[111]   Id.

[112]   Id.

[113]   Tr. 492.

[114]   Tr. 491.

[115]   Tr. 284.

[116]   Tr. 6.

[117]   Tr. 535.

[118]   Tr. 538.

aptitude to perform unskilled work as "fair."[119]   Dr. Samiuddin ranked Plaintiff "poor or none" in ability to maintain attention for a two hour segment, work in coordination or in proximity to others without being unduly distracted, and accept instructions and respond appropriately to criticism from supervisors."[120]   Dr. Samiuddin ranked Plaintiff's ability to perform semiskilled, skilled, and particular types of jobs as "good"[121] to "fair."[122]   Dr. Samiuddin also opined that Plaintiff had "good response to current treatment."[123]

Despite Dr. Samiuddin's prognosis, Plaintiff's GAF scores fluctuated.  Plaintiff had a GAF score of 50 on August 29, 2001, and a score of 57 on September 19, 2001, and November 12, 2001.[124]   On January 16, 2002, his GAF score was 50, and it was noted that his medication needed adjustment.[125]  Plaintiff's GAF score was 65 on May 20, 2002, and on June 18, 2002, it was 55.[126]   Plaintiff received a score of 60 when he was seen on July 22, 2002.[127]  On September 25,

---

[119]   Id.  A rating of "fair" indicates that one's ability to function is seriously limited, but not precluded.

[120]   Id.  A rating of "poor or none" indicates that one has no useful ability to function in this area.

[121]   Tr. 539.  A rating of "good" indicates that one's ability to function is limited but satisfactory.

[122]   Tr. 538.

[123]   Tr. 536.

[124]   Tr. 559-60.

[125]   Tr. 555.

[126]   Tr. 552, 554.

[127]   Tr. 551.

2002, Plaintiff's GAF score was ranked 55-60.[128]   Thereafter, Plaintiff's GAF score remained at 55 or above until his final assessment shortly before the supplemental hearing, on September 5, 2003, where he scored a 65.[129]

### C. Vocational Expert's Testimony

After reviewing the file and listening to the testimony, the VE, Patricia A. Cowen ("Ms. Cowen"), opined that Plaintiff's prior work as a furniture mover was heavy and unskilled, and as an apartment make-ready person and janitor was medium and unskilled.[130] Ms. Cowen testified that she was familiar with the jobs that existed in the region and she indicated she would use Harris County and the surrounding counties to respond to the ALJ's inquiries.[131]   The ALJ then posed the following hypothetical:

> Assume for the purpose of a hypothetical question, an individual who is 45 years of age–excuse me– make that 46.  And assume that this individual has a seventh grade education. Assume that this individual has the following nonexertional limitations.     Assume this individual can relate to co-workers, to the public and to supervisors only on an occasional basis.   Assume this individual is limited to simple repetitive task[s], requiring simple instructions.    In your opinion, could an individual with those limitations perform any of the past relevant work that you have described for the claimant?[132]

---

[128]   Tr. 549.

[129]   Tr. 499, 544, 569, 570-73.

[130]   Tr. 57-58.

[131]   Tr. 58.

[132]   Tr. 58-59.

Ms. Cowen opined that such an individual could perform work as an apartment make-ready person and as a janitor.[133]

After hearing the testimony and reviewing the medical record, the ALJ found that Plaintiff was not disabled within the meaning of the Act at any time during the period covered by his application because he could return to his past relevant work as an apartment make-ready person or janitor.[134]

The Appeals Council denied Plaintiff's request for review and approved the ALJ's decision, thereby making it the final decision of the Commissioner.[135]  Plaintiff timely sought judicial review of the decision.

## II. Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner to deny disability benefits is limited to two issues: 1) whether proper legal standards were used to evaluate the evidence; and 2) whether substantial record evidence supports the decision.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002); Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).

The widely accepted definition of "substantial evidence" is "something more than a scintilla but less than a preponderance." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000); Brown, 192 F.3d

---

[133]    Tr. 59.

[134]    Tr. 24.

[135]    Tr. 7.

at 496.   In applying this standard, the court is to review the entire record, but may not reweigh the evidence, decide the issues de novo, or substitute its judgment for that of the Commissioner. Brown, 192 F.3d at 496.   The Commissioner is given the responsibility of deciding any conflicts in the evidence.   Id.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."   42 U.S.C. § 405 (g).   Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.   Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).   In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless.   Brown, 192 F.3d at 496.

The legal standard for determining disability under the Act is whether the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months."   42 U.S.C. § 423(d)(1)(A).   To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe impairment;" (3) a claimant whose impairment meets or is

20

> equivalent to an impairment listed in [20 C.F.R. Part 404, Subpart. P, Appendix 1 ("the Listings")] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and residual functional capacity must be considered to determine whether he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994).

To be entitled to benefits, a claimant bears the burden of proving he is disabled within the meaning of the Act. Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991). By judicial practice, this translates into the claimant bearing the burden of proof on the first four of the above steps and the Commissioner bearing it on the fifth. Brown, 192 F.3d at 498; Greenspan v. Shalala, 38 F.3d 232, 236 ( Cir. 1994), cert. denied, 514 U.S. 1120 (1995). The analysis stops at any point in the five-step process upon a finding that the claimant is or is not disabled. Greenspan, 38 F.3d at 236.

Pain can constitute a disabling impairment. See Cook v. Heckler, 750 F.2d 391, 395 (5th Cir. 1985). However, pain constitutes a disabling condition only when it is "constant, unremitting, and wholly unresponsive to therapeutic treatment." Selders v. Sullivan, 914 F.2d 614, 618-19 (5th Cir. 1990)(quoting Harrell v. Bowen, 862 F.2d 471, 480 (5th Cir. 1988)). The ALJ is required to consider subjective evidence of pain along with other record evidence, but is ultimately responsible for making the determination of whether the pain is debilitating. Wren, 925 F.2d

at 128.  "While an ALJ must consider an applicant's subjective complaints of pain, he is permitted to examine objective medical evidence in testing the applicant's credibility.  He may find, from the medical evidence, that an applicant's complaints of pain are not to be credited or are exaggerated."  Johnson v. Heckler, 767 F.2d 180, 182 (5th Cir. 1985).

### III. Analysis

In the administrative proceedings, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged date of onset and that Plaintiff's depression and history of substance abuse were severe medical impairments.[136]  The ALJ found that Plaintiff's medically determinable impairments did not meet or medically equal any of the Listings.[137]  The ALJ found Plaintiff's allegations regarding his limitations not wholly credible.[138]  The ALJ reported that after considering all of the medical opinions in the record regarding the severity of Plaintiff's impairments, he had determined Plaintiff retained the RFC to perform work at any exertional level, and that Plaintiff was restricted by his nonexertional impairments to simple repetitive tasks with simple instructions.[139]  Further, the ALJ found that Plaintiff's past relevant work did not require the performance of work-related

---

[136]   Tr. 25.

[137]   Id.

[138]   Id.

[139]   Id.

activities precluded by Plaintiff's RFC.[140]   The ALJ also determined
that Plaintiff's medically determinable depression and his history
of substance abuse did not prevent him from performing his past
jobs.[141]   Consequently, the ALJ concluded that Plaintiff was not
under a "disability" as defined in the Act at any time through the
date of decision.[142]

Plaintiff requests judicial review of the ALJ's decision to
deny disability benefits.  Plaintiff contends the ALJ's decision is
not supported by substantial evidence and that the ALJ did not
follow proper legal procedures.

In his motion for summary judgment, Plaintiff sets forth four
primary arguments specifying why the ALJ committed reversible error
in his decision.  Plaintiff first contends that the ALJ failed to
obtain an updated opinion from a medical expert concerning the issue
of medical equivalence and RFC, and thus violated Social Security
Ruling (SSR) 96-6p.[143]  Second, he argues that the ALJ misinterpreted
the significance of Plaintiff's GAF scores.[144]   Next, Plaintiff
asserts that the ALJ erred by failing to follow "the instructions
and the cautions" in <u>Manso-Pizarro v. Secretary</u>, 76 F.3d 15, 17 (1st
Cir. 1996), and <u>Berrios Lopez v. Secretary</u>, 951 F.2d 427 (1st Cir.

---

[140]    <u>Id.</u>

[141]    <u>Id.</u>

[142]    <u>Id.</u>

[143]    Memorandum of Points and Authorities in Support of Plaintiff's Motion
for Summary Judgment, Docket Entry No. 15.

[144]    <u>Id.</u>

1991).[145]  Finally, Plaintiff argues that the ALJ failed to evaluate properly the opinion of Plaintiff's treating physician.[146] Defendant, on the other hand, contends the ALJ employed proper legal standards in reviewing the evidence and that the ALJ's decision is supported by substantial evidence.[147]   Defendant, therefore, maintains the ALJ's decision should stand.[148]   The court will consider all arguments in turn.

Plaintiff first contends that the ALJ erred by failing to obtain an updated opinion from a medical expert, pursuant to SSR 96-6p.[149]  Plaintiff alleges that the ALJ was "clearly out of his depth" in evaluating the medical record.[150]   The court disagrees.

According to SSR 96-6p, an ALJ must obtain an updated opinion from a medical expert in the following circumstances:

> (1) When no additional medical evidence is received, but in the opinion of the administrative law judge or the Appeals Council the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable; or (2) When additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the

---

[145]    Id.

[146]    Id.

[147]    Brief in Support of Defendant's Motion for Summary Judgment, Docket Entry No. 20.

[148]    Id.

[149]    Id.

[150]    Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment, Docket Entry No. 15.

impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.[151]

During the hearing held on September 21, 2000, Dr. Pollock testified as a medical expert and provided the ALJ guidance in evaluating Plaintiff's medical record.[152]   Although Plaintiff's medical history accumulated new data during the three years between that hearing and the supplemental hearing, no medical expert offered updated testimony.  At issue is whether the ALJ was required to have an updated medical expert's opinion.

The presence of new medical evidence requires the court to analyze the second scenario in SSR 96-6p.  This portion instructs that when additional medical evidence is received that "in the opinion" of the ALJ may change the finding, updated medical expert testimony is proper.   In the final decision denying Plaintiff benefits, the ALJ opined that the objective clinical findings did not support the degree of pain and functional limitations that Plaintiff alleged.[153]  However, the ALJ pointed out that the issue was not the existence of pain but, instead, whether the degree to which Plaintiff experienced was sufficient to constitute a disability under the Act.[154]  Specifically, the ALJ observed that Plaintiff's medical records did not show repeated hospitalizations

---

[151]   SSR 96-6P, 1996 WL 374180 (S.S.A.).

[152]   Tr. 92.

[153]   Tr. 23.

[154]   Id.

or aggressive forms of therapy (such as surgery or treatment at a pain clinic) that would be expected if Plaintiff experienced severe, persistent, and unremitting pain.[155]   The ALJ also noted that Plaintiff's pain and other symptoms appeared to be brought on or aggravated by strenuous exertional activities, such as prolonged standing or walking, associated with heavy work and not by the less strenuous activities associated with medium or light work.[156]  To the extent that the ALJ based his decision on these factors, nothing in the new medical evidence that accrued between the first decision and the supplemental hearing appeared to exist that would change the ALJ's opinion that Plaintiff's impairments did not meet or equal one of the Listings.

Although Plaintiff's medical records detail a number of additional evaluations and treatments, there was no new evidence of any "aggressive forms of therapy" consistent with "severe, persistent, and unremitting pain" that may have affected the ALJ's decision.   Accordingly, the ALJ was not required to receive an updated opinion from a medical expert.

Moreover, procedural perfection is not required, and a judgment should not be vacated unless the substantial rights of a party have been affected.   See Anderson v. Sullivan, 887 F.2d 630, 634 (5th Cir. 1989).  Procedural improprieties constitute a basis for remand

---

[155]    Id.

[156]    Id.

only if such improprieties cast into doubt the existence of substantial evidence to support the ALJ's decision.  Morris v. Bowen, 864 F.2d 333, 335 (5th Cir. 1988).  Plaintiff has not demonstrated that his substantial rights were affected as a result of the ALJ's failure to obtain an updated medical expert opinion. Specifically, Plaintiff does not argue that this omission casts into doubt the existence of substantial evidence supporting the ALJ's decision.  The ALJ relied upon Dr. Pollock's testimony to interpret the majority of Plaintiff's medical records.  As stated above, the supplemental medical evidence did not appear substantially different in kind from the evidence originally proffered.  Moreover, although Plaintiff asserts that a medical expert was needed to interpret the supplemental medical evidence and to explain the effect of his impairments, he has pointed the court to no evidence that, had a medical expert been permitted to testify, would have been adduced at the hearing and that might have altered the result of the proceeding.  Accordingly, the absence of updated medical expert testimony was not reversible error.

Plaintiff's second and third arguments are essentially the same complaint:  that the ALJ misinterpreted Plaintiff's medical data. In his second argument, Plaintiff contends the ALJ failed to properly interpret the significance of the GAF scores.[157]  In his third, Plaintiff contends the ALJ was not qualified to interpret raw

---

[157]    Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment, Docket Entry No. 15.

medical data.[158]   Both arguments are without merit.

First, it is well settled in the Fifth Circuit that the ALJ makes the ultimate determination about whether a claimant is disabled.  See Wren, 925 F.2d at 128; accord § 404.1512(b)(6).  In interpreting the medical evidence, an ALJ is not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists.  Id.  Accordingly, the ALJ's decision, to the extent he relied on Plaintiff's GAF scores, should not be disturbed, absent evidence to the contrary.  This is especially true in Plaintiff's case, where the medical record contains enough satisfactory GAF ratings to furnish substantial evidence in support of the ALJ's decision.  Moreover, there is no evidence, as Plaintiff suggests, that the ALJ "failed utterly to comprehend" the GAF continuum.  Accordingly, it was not error for the ALJ to determine the significance and weight of Plaintiff's GAF scores.

Similarly, Plaintiff fails to demonstrate that the ALJ erred in interpreting the medical evidence.  Plaintiff contends that the ALJ, as a lay person with no advanced medical understanding, was not qualified to interpret raw medical data.  Plaintiff argues that the ALJ failed to follow the instructions and cautions in Manso-Pizarro and Berrios Lopez, two opinions rendered by the First Circuit.  Plaintiff suggests that these two decisions stand for the

---

[158]     Id.

proposition that an ALJ is unfit to interpret medical evidence. However, Plaintiff's reliance on these cases to support his contention is misplaced.

First, the ALJ was not required to follow the "instructions and cautions" of the two cases from the First Circuit.  Second, even if the ALJ had elected to follow First Circuit law because of the lack of published Fifth Circuit opinions on the matter, the two cases Plaintiff selected are factually distinct, and, therefore, do not support his position.  While in both cases the First Circuit considered whether an ALJ is qualified to interpret medical data, both decisions hinged on the fact that the ALJ unilaterally determined the claimant's disability status without <u>any</u> analysis of functional capacity by a physician or other expert.  <u>Manso-Pizarro</u>, 76 F.3d at 17; <u>Berrios Lopez</u>, 951 F.2d at 430.  This is not the situation here because the ALJ relied on medical advice from ME Pollock and various physicians to make his decision.  Furthermore, the First Circuit specifically noted in <u>Manso-Pizarro</u> that where the medical evidence shows relatively little physical impairment, an ALJ permissibly can render a common sense judgment about functional capacity without a physician's assessment.  <u>Manso-Pizarro</u>, 76 F.3d at 17.  Accordingly, because the medical record in the instant case reflected virtually no change in Plaintiff's mental functions and relatively little physical impairment, the ALJ did not overstep the bounds of lay competence.

In his final argument, Plaintiff contends the ALJ failed to

analyze properly the opinions of his treating physicians.  Plaintiff argues that the ALJ did not give proper weight to the physician treating his mental impairments and that the ALJ blatantly disregarded the medical evidence of Plaintiff's cardiovascular problems.  The court disagrees on these points as well.

The ALJ may rely on the opinion of a non-examining physician to the extent explained in the regulations.  See 20 C.F.R. §§ 404.1527, 416.927.  If the medical expert's opinion is consistent with the record as a whole and is accompanied by a supporting explanation, the opinion provides a solid basis for the ALJ's decision.  See 20 C.F.R. §§ 404.1527 (a)-(e) and (f)(2)(iii), 416.927 (a)-(e) and (f)(2)(iii).  On the other hand, if the ALJ relied on inaccurate medical expert testimony and the claimant was prejudiced by the ALJ's reliance on that testimony, the error may warrant reversal of the ALJ's decision.  See Carey v. Apfel, 230 F.3d 131, 143 (5th Cir. 2000).  Only if the ALJ summarily rejects the testimony of a "treating physician" based only on the testimony of a nonspecialty, nonexamining medical expert, should the ALJ's decision be overturned.  Myers v. Apfel, 238 F.3d 617, 621 (5th Cir. 2001)(citing Newton v. Apfel, 209 F.3d 448, 458 (5th Cir. 2000)).

In this case, Dr. Pollock's review of Plaintiff's medical record was accurate, consistent with the record as a whole, and supported by sufficient explanation.  Moreover, Dr. Samiuddin, Plaintiff's treating physician for his mental impairments, appeared to agree with Dr. Pollock's findings to a large extent.  Plaintiff

points out that Dr. Samiuddin found that Plaintiff had "poor" ability to concentrate.[159]  However, Plaintiff fails to note that the majority of Dr. Samiuddin's report is consistent with Dr. Pollock's findings.[160]  For example, Dr. Samiuddin's opinion overall was that Plaintiff's mental abilities ranged from "fair to good," which is consistent with Dr. Pollock's findings that Plaintiff's impairments imposed a "slight" degree of limitation.[161]  Moreover, both doctors' opinions comport with the other medical assessments on record that Plaintiff retained sufficient capability to perform his past work. Because Dr. Samiuddin's opinion is relatively consistent with the other medical evidence, it follows that the weight the ALJ assigned it becomes a moot point.  Similarly, the court does not find that the ALJ blatantly ignored the cardiovascular record or failed to seek clarification, as Plaintiff suggests.  During the supplemental hearing, the ALJ noted there was no medical evidence regarding Plaintiff's heart condition.[162]  The ALJ offered to give Plaintiff's counsel additional time to submit any documents relating to the matter.[163]  Plaintiff's counsel declined the offer and indicated that the record was complete.[164]  Plaintiff's post-hoc attempt to re-visit

---

[159]    Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment, Docket Entry No. 15.

[160]    Tr. 535-40.

[161]    Tr. 535-40, 92.

[162]    Tr. 61.

[163]    Tr. 61-62.

[164]    Tr. 62.

this issue is futile.  Accordingly, for the reasons discussed above, the court finds that the ALJ did not err in evaluating Plaintiff's treating physician's opinion or Plaintiff's cardiovascular record.

Finding no legal error in the ALJ's decision, the court should not disturb it if substantial record evidence supports the ALJ's finding that Plaintiff is not disabled.  The court recognizes the seriousness of Plaintiff's medical condition and appreciates the difficulties Plaintiff encountered in seeking proper medical treatment to relieve his suffering.[165]  However, the court must review the record with an eye toward determining only whether the ALJ's decision is supported by more than a scintilla, but less than a preponderance, of evidence.  See Carey, 230 F.3d at 135.  The court finds more than a scintilla of evidence in support of the ALJ's decision.  Therefore, the court cannot overturn the decision of the ALJ, who is given the task of weighing the evidence and deciding disputes.  See Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2001); Carrier v. Sullivan, 944 F.2d 243, 247 (5th Cir. 1991).

The ALJ's decision is supported by substantial evidence and is based on an application of sound legal standards.  Accordingly, because the Commissioner is entitled to judgment as a matter of law, the grant of summary judgment in the Commissioner's favor is

---

[165]  Plaintiff advised that he has been homeless, dysfunctional, repeatedly suicidal, and is a virtual shut-in.  See, Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment, Docket Entry No. 15.

appropriate.

## IV. Conclusion

For all of the foregoing reasons, the court **GRANTS** Defendant's Motion for Summary Judgment and **DENIES** Plaintiff's Cross Motion for Summary Judgment.

**SIGNED** in Houston, Texas, this 15th day of August, 2005.

Nancy K. Johnson
United States Magistrate Judge

33